THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **3:18-CR-279** |
| | : | **(JUDGE MARIANI)** |
| MICHAEL RINALDI, | : | |
| | : | |
| Defendant. | : | |

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **3:18-CR-280** |
| | : | **(JUDGE MARIANI)** |
| MICHAEL RINALDI, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Defendant Michael Rinaldi's "Motion to Dismiss" (3:18-cr-279, Doc. 310; 3:18-cr-280, Doc. 255).

On August 21, 2018, a federal Grand Jury charged Defendants Michael Rinaldi, Dwayne Romail Brown, and Andrew Henry with one count of Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, cocaine and cocaine base, in violation of 21 U.S.C. §§ 841 and 846.  (*See* 3:18-cr-279, Doc. 37).  That same day, the federal grand jury also returned an indictment charging Defendants Michael Rinaldi, Steven Powell, Jessica Caldwell, and George Kokenyei with Conspiracy to Distribute and Possess

with Intent to Distribute a Controlled Substance, marijuana, in violation of 21 U.S.C. §§ 841 and 846.  (*See* 3:18-cr-280, Doc. 1).

On January 16, 2019, at the request of Defendant Rinaldi, the Court held a hearing in accordance with *Faretta v. California*, 422 U.S. 806 (1975) and *United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002), wherein it conducted a colloquy with Defendant Rinaldi, in the presence of his CJA appointed counsel Joseph Blazosek, to determine whether Defendant Rinaldi understood the responsibilities and consequences of self-representation, was knowingly, voluntarily, and intelligently waiving his right to counsel, and would be permitted to represent herself.  Following this colloquy, the Court determined that Mr. Rinaldi had knowingly, voluntarily, and intelligently waived the right to counsel and understood the ramifications and consequences of proceeding *pro se* and therefore granted Mr. Rinaldi's request to represent himself in criminal actions 3:18-cr-279 and 3:18-cr-280.  The Court thereafter appointed Attorney Blazosek as stand-by counsel at the request of Defendant.

On January 21, 2020, the Government filed a First Superseding Indictment in 3:18-cr-279, charging Michael Rinaldi with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, specifically cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C. §§ 841 and 846 (Count I) and with Distribution and Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841 (Count II).  (*See* Doc. 220).[1]

---

[1] As explained, Michael Rinaldi is a defendant in two criminal cases: 3:18-cr-279 and 3:18-cr-280. Defendant filed the same motion at issue here in both 3:18-cr-279 and 3:18-cr-280.  Unless otherwise

Presently before the Court is Defendant's "Motion to Dismiss" (Doc. 310), filed on July 9, 2020.  For the following reasons, the Court will deny this motion.

## II. ANALYSIS

Rinaldi's "Motion to Dismiss" (Doc. 310) moves to dismiss the indictments in the cases "for violations of his rights under the Due Process Clause, the equal protection clause, selective prosecution and for violations of his statutory rights." (Doc. 310, at 1).

As a basis for "Ground One" of Defendant's motion to dismiss, he "contends that his prosecution is the result of selective enforcement and also violates the equal protection clause as well as his statutory rights" as the "decision to arrest and charge him was based on his race and economic status." (Doc. 310, at 4).  In support of this argument, Rinaldi asserts that "drug crimes" are "consensual transactions" with "no clear victim or perpetrator" and that "[s]trategic choices must be made about whom to target and what tactics to employ, and this is where the bias is implemented." (*Id.* at 3). Defendant argues that "police and prosecutors routinely use race and economic status as determining factors in where, how, and who to prosecute" and that "[i]n the instant case this was actualized when the arresting agents repeatedly" called Rinaldi a series of racial epithets "in the basement of the Mohegan Sun Casino". (*Id.* at 3).

---

stated, for purposes of clarity, the Court's citation to specific document numbers reference the document number set forth in the first case filed at docket number 3:18-cr-279.

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The standard to prove a claim of selective prosecution "is a demanding one." *Id.*

"[A] prosecutor's discretion [to enforce the Nation's criminal laws] is subject to constitutional constraints," including, pursuant to the equal protection component of the Due Process Clause of the Fifth Amendment, that the decision to prosecute "may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (internal citations and quotation marks omitted).

However, because "[t]he Attorney General and United States Attorneys retain broad discretion  to enforce the Nation's criminal laws", "[t]he presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (internal citations and quotation marks omitted). Thus, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id*.

"In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Armstrong*, 517 U.S. at 465.  To prevail on a selective prosecution claim, a defendant "must

demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* (internal quotation marks omitted). "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.  See also, United States v. Taylor,* 686 F.3d 182, 197 (3d Cir. 2012) ("To establish selective prosecution, the defendant must provide evidence that persons similarly situated have not been prosecuted and that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor.  The defendant bears the burden of proof, and must establish each of these elements with 'clear evidence' sufficient to overcome the presumption of regularity that attaches to decisions to prosecute.") (internal citations and quotation marks omitted).

Here, Defendant has not presented evidence that similarly situated individuals of a different race were not prosecuted or that the decision to prosecute him was made on the basis of his race.  Rinaldi's broad statements and citations to several scholarly writings may support a general argument that African Americans, as a whole, are prosecuted and convicted more often than Whites for violations of laws relating to controlled substances. Defendant's argument amounts only to a wholesale attack on the entire United States' criminal justice system.  Rinaldi presents no legal or factual assertions, or evidence, to support a claim that his prosecution in the present cases was based on his race or any other unjustifiable standard.  Nor has Rinaldi even attempted to show that other individuals

of a different race, similarly situated to him, allegedly committed a similar crime but were not

prosecuted for it despite the Government's ability to do so.  *See Armstrong*, 517 U.S. at 469

("The vast majority of the Courts of Appeals require the defendant to produce some

evidence that similarly situated defendants of other races could have been prosecuted, but

were not, and this requirement is consistent with our equal protection case law.").

Significantly, Defendant does not offer any evidence that <u>he</u> was prosecuted on the basis of

his race, instead only offering an argument that people of color are more likely to be

prosecuted for "drug crimes", and thus making the speculative and conclusory extrapolation

that he was therefore prosecuted due to his race.  *Cf. McCleskey v. Kemp*, 481 U.S. 279,

292-293 (1987) (". . . to prevail under the Equal Protection Clause, [a defendant] must prove

that the decisionmakers in *his* case acted with discriminatory purpose. He offers no

evidence specific to his own case that would support an inference that racial considerations

played a part in his sentence.") (emphasis in original).

Defendant's broad citations to a small number of scholarly articles and reports,

without more, do not present "clear evidence" of selective prosecution.[2]  *See Armstrong*,

517 U.S. at 470; *United States v. Bass*, 536 U.S. 862, 863-864 (2002) (even assuming a

defendant can show "some evidence of both discriminatory effect and discriminatory intent"

---

[2] Defendant does not attach copies of any of the sources to which he cites, forcing the Court to attempt to find these documents.  Nor did Defendant include pin-cites to any of his cited authorities, despite certain citations being to books (*see e.g.* Doc. 310 at 13 (citing generally the book "Doing Time on the Outside") and lengthy reports (*see e.g. id*. (citing generally "Juvenile Offenders and Victims: 2006 National Report", a 260-page document)).  In addition, upon review, the Court notes that all of Defendant's cited authority is over 10 years old, thereby diminishing the relevance, if any, these documents may have.

by a "nationwide showing (as opposed to a showing regarding the record of the

decisionmakers in [Defendant's] case), raw statistics regarding overall charges say nothing

about charges brought against *similarly situated defendants.*") (emphasis in original).  *See*

*also*, *McCleskey*, 481 U.S. at 293 (Defendant's claim that the statistics presented in support

of his equal protection claim "are sufficient proof of discrimination, without regard to the

facts of a particular case, would extend to all capital cases in Georgia, at least where the

victim was white and the defendant is black."); *United States v. Gist*, 382 F.App'x 181, 183-

184 (3d Cir. 2010) (denial of defendant's motion appropriate where the evidence in support

of selective prosecution claim consisted of affidavits from Defendant and three other

inmates "alleging in general terms that racial discrimination and selective prosecution are

rampant" at the prison, and Defendant pointed "to no evidence that the prosecutor in his

case-the United States Attorney for the Middle District of Pennsylvania-was motivated by

any racial animus.").

The only specific factual assertion made by Defendant in support of his selective

prosecution argument is that, at the time of his arrest, "the arresting agents repeatedly" called

him a series of racial epithets.  (Doc. 310 at 3).  The Government responds, and Defendant

does not dispute, that the "arresting officers were never involved in the investigation of the

crimes committed by Rinaldi and his coconspirators" because the "investigating agents were

tied up in the Eastern District of Pennsylvania obtaining and executing a search warrant on

Dwayne Brown's vehicle."  (Doc. 313, at 8).  There is no dispute that the arresting officers in

this case were not involved with any other aspect of the cases involving Rinaldi.  Thus, even crediting Defendant's statements with respect to the arresting officers, this, without more, has no effect on Defendant's selective prosecution claim.

For the afore-discussed reasons, Defendant has failed to meet the "demanding" standard necessary to establish a claim of selective prosecution.

Defendant next asserts in "Ground Two" that "[t]he process by which the Scranton division of The United States District Court for the Middle District of Pennsylvania uses to select both grand and petit jurors does not comply with the directives of 28 U.S.C. [§§] 1861, 1862, 1863 and 1867."  (Doc. 310, at 4-5).

The Middle District of Pennsylvania has adopted a "Juror Selection Plan", which has been examined by a "Reviewing Panel, consisting of the members of the Judicial Council of the Third Circuit and the Chief Judge of the United States District Court for the Middle District of Pennsylvania", and ascertained to be in compliance "in all particulars with the Jury Selection and Service Act of 1968 (28 U.S.C. § 1861, et seq.) and 28 U.S.C. § 1878." (*See* Misc. No. 89-69, "IN RE: Amendment to the Juror Selection Plan for the United States District Court, Middle District of Pennsylvania" (Before the Reviewing Panel of the Third Circuit) (Sept. 17, 2013)).  Pursuant to the Juror Selection Plan:

> Voter registration lists represent a fair cross section of the community in the Middle District of Pennsylvania.  Accordingly, names of grand and petit jurors serving in the court shall be selected by randomized procedure from the voter registration lists of all counties within the relevant divisions. The voter registration lists are maintained by the Commonwealth of Pennsylvania Department of State.

(Juror Selection Plan, United States District Court for the Middle District of Pennsylvania, §

401). Voter registration lists "mean the voter registration lists for a statewide primary or

general election as maintained by the Commonwealth of Pennsylvania Department of State

on electronic data files." (*Id*. at § 403). In addition,

> In accordance with 28 U.S.C. § 1863(b)(2), the court may authorize the Clerk
> to draw names of prospective jurors from one or more supplementary sources
> of names in addition to voter registration lists where necessary to foster the
> policy and protect the rights secured by 28 U.S.C. §§ 1861 and 1862. . . .

(*Id*. at § 402).

Rinaldi contends that "[f]or the creation of its master jury wheel the names used by

the Scranton division are drawn from registered voters rather than actual voters" from nine

counties, which have "no uniform requirements for the registration of it[s] voters" and thus

"the use of registered voters does not comply with the requirements of section 1863."[3]

(Doc. 310, at 5-6). Defendant further alleges that it is "widely known that Hispanics, Latinos,

Blacks and other minorities register to vote in far lower numbers than whites" and that

"[t]hese same discrepancies also appear when you compare women to men or the more

affluent to the economically disadvantaged." (*Id*. at 6). Although Rinaldi admits in his Reply

Brief that "the government is correct in the position that jurors can be drawn from the names

---

[3] Section 1863, entitled "Plan for Random Jury Selection", requires that "[e]ach United States
district court shall devise and place into operation a written plan for random selection of grand and petit
jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall
otherwise comply with the provisions of this title," 28 U.S.C. § 1863(a), and sets forth the required contents
of the plan.

of registered voters" he asserts that "this is only in a general sense" (Doc. 332, at 3) and

that the Middle District of Pennsylvania's Master Jury Wheel violates the requirements of

section 1863 in various respects (Doc. 310, at 5-6).

Claims under the Jury Selection and Service Act are analyzed under the same

standard as a Sixth Amendment fair cross section claim.  *United States v. Weaver*, 267 F.3d

231, 236 (3d Cir. 2001).  Pursuant to the Jury Selection and Service Act,

> It is the policy of the United States that all litigants in Federal courts entitled to
> trial by jury shall have the right to grand and petit juries selected at random
> from a fair cross section of the community in the district or division wherein the
> court convenes. It is further the policy of the United States that all citizens shall
> have the opportunity to be considered for service on grand and petit juries in
> the district courts of the United States, and shall have an obligation to serve as
> jurors when summoned for that purpose.

28 U.S.C. § 1861. However,

> This requirement of a fair cross section is not without substantial limits – it does
> not guarantee that juries be of any particular composition. All that is required is
> that the jury wheels, pools of names, panels, or venires from which juries are
> drawn *must not systematically exclude distinctive groups in the community* and
> thereby fail to be reasonably representative thereof.  The objectives of the fair
> cross section requirement include avoiding the possibility that the composition
> of the juries would be arbitrarily skewed in such a way as to deny criminal
> defendants the benefit of the common-sense judgment of the community and
> avoiding the appearance of unfairness that would result from excluding large
> groups of individuals, not on the basis of their ability to serve as jurors, but on
> the basis of some immutable characteristic such as race, gender or ethnic
> background.

*Weaver*, 267 F.3d at 236 (internal citations and quotation marks omitted) (emphasis in

original).

To establish a prima facie violation of the fair cross section requirement of the Sixth

Amendment and the Jury Selection and Service Act, a defendant must demonstrate:

> (1) the group alleged to be excluded is a "distinctive" group in the community;
> (2) the representation of this group in jury venires is not "fair and reasonable"
> in relation to the number of such persons in the community; and (3) the
> underrepresentation is caused by the "systematic exclusion of the group in the
> jury selection process."  A defendant need not show discriminatory intent.

*Weaver*, 267 F.3d at 237 (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 368 n.26 (1979)).

Upon a prima facie showing by the defendant of an infringement of his constitutional right to

a jury drawn from a fair cross section of the community, the burden shifts to the Government

to justify this infringement "'by showing attainment of a fair cross section to be incompatible

with a significant state interest.'" *Id*. (quoting *Duren,* 439 U.S. at 368).

With respect to the first prong, "when a specific population such as African-

Americans or Hispanics is claimed to be underrepresented by the voter rolls, the relevant

inquiry is simply whether African-Americans and Hispanics are cognizable groups."

*Weaver*, 267 F.3d at 239.  The Third Circuit has answered this inquiry in the affirmative.  *Id*.

at 240.  Thus, Rinaldi has met the first prong of the test by asserting a "distinctive group"

consisting of "Hispanics, Latinos, [and] Blacks" (Doc. 310, at 6).[4]

The second prong Rinaldi must demonstrate is that the representation of "Hispanics,

Latinos, [and] Blacks" is not "fair and reasonable" in relation to the number of such persons

---

[4] Rinaldi's vague reference to "economically disadvantaged" individuals is far too broad and
undefined to be considered a "distinctive group."

in the community.  "This is, at least in part, a mathematical exercise, and must be supported by statistical evidence. Initially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Weaver*, 267 F.3d at 240 (internal citation and quotation marks omitted).  Here, Defendant has not even met his initial burden – he has provided no statistical evidence, or other supporting documentation, of the percentage of the community of "Hispanics, Latinos, and Blacks" in the Middle District of Pennsylvania.  Nor has Rinaldi presented any other evidence in support of his claim.  In addition, as the Middle District of Pennsylvania Jury Clerk has already notified Rinaldi in a letter dated August 27, 2019, "Race/gender statistics are maintained in the Jury Management System by percentages to guarantee that the make-up of these nine counties [which comprise the master jury wheel for the Scranton vicinage] is being proportionally represented in each master jury wheel. These reports are required by the Administrative Offices of the U.S. District Court to ensure compliance." (*See* Form AO 12: Jury Representativeness Statistics).  Defendant has thus also failed to carry his prima facie burden of demonstrating that the representation of "Hispanics, Latinos, and Blacks" is not fair and reasonable in relation to the number of such persons in the community.

With respect to the third prong, a defendant must show that the underrepresentation is caused by the "systematic exclusion of the group in the jury selection process." "'[S]ystematic exclusion' can be shown by a large discrepancy repeated over time such that

the system must be said to bring about the underrepresentation." *Weaver*, 267 F.3d at 244.

As the Third Circuit has noted, "if the use of voter registration lists over time did have the

effect of sizeably underrepresenting a particular class or group on the jury venire, then

under some circumstances, this could constitute a violation of a defendant's 'fair cross-

section' rights under the [S]ixth [A]mendment." *Weaver*, 267 F.3d at 244-245 (internal

quotation marks omitted).  While a Court examines the strength of the evidence presented

under the second prong of the analysis, in evaluating the third prong, the Court should

consider "the nature of the process and the length of time of underrepresentation." *Weaver*,

267 F.3d at 241.  Here, again, Rinaldi has not provided *any* evidence to support his

assertion that the "process by which the Scranton division of the United States District Court

for the Middle District of Pennsylvania uses to select both grand and petit jurors does not

comply with the directives of" the Jury Selection and Service Act, and specifically 28 U.S.C.

§§ 1861, 1862, 1863, and 1867.  Rinaldi does not even assert facts, let alone provide any

evidence, setting forth the nature of the process by which jury lists are composed and the

length of time of underrepresentation of "Hispanics, Latinos, and Blacks" or any other

minorities.  The record is thus devoid of any evidence that is demonstrative of any

persistent, on-going, "systematic exclusion" of "Hispanics, Latinos, and Blacks" or other

"distinctive group".

As a result, Defendant has failed to demonstrate the second and third prongs of the *Duren* analysis and thus establish a prima facie violation of the fair cross section requirement of the Sixth Amendment and the Jury Selection and Service Act. [5]

Furthermore, Defendant's argument that the 9 counties which comprise the Scranton/Wilkes-Barre Division for jury selection purposes "have no uniform requirements for the registration of it [*sic*] voters" and therefore "the use of registered voters does not comply with the requirements of section 1863" (Doc. 310, at 5-6) is without merit. Defendant's argument appears to derive from one sentence of § 1863(b)(3) which states that: "For the purposes of determining proportional representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly required throughout the district or division, may be used." However, once again, Defendant does not provide any evidence in support of his conclusory assertions. He does not provide any evidence that the nine counties do not, in fact, have uniform requirements, nor does he include evidence, or even explanation, what the voter registration requirements

---

[5] In his Reply brief, Rinaldi appears to abandon any argument that the manner in which the Master Jury Wheel is comprised results in a disproportionately low number of minorities being included in this list or that distinctive groups, such as "Hispanics, Latinos, [and] Blacks" are being systematically excluded. (*See* Doc. 332, at 4) ("The Scranton Division does not have any uniform requirement for the registration of voters. Therefore the names of jurors should be drawn from the number of actual voters and not the number of registered voters. This has nothing to do with the race of the voters this is how they determine the proportionality of representation from each county within the Scranton division."). The Court has nonetheless addressed the argument out of an abundance of caution.

are in the nine counties.[6]  Defendant further does not provide any legal support for his

conclusion that any differences in voting registration in the nine counties are sufficient to

negate a "uniformity" requirement, and are not merely minor, technical, or tangential

differences.

In addition, the Jury Selection and Service Act ensures "that all litigants in Federal

courts entitled to trial by jury shall have the right to grand and petit juries selected at random

from a fair cross section of the community in the district or division wherein the court

convenes", 28 U.S.C. § 1861.  This Court re-iterates that the obligation of a fair cross section

requires "that the jury wheels, pools of names, panels, or venires from which juries are drawn

*must not systematically exclude distinctive groups in the community* and thereby fail to be

reasonably representative thereof" and that the "objectives of the fair cross section

requirement include avoiding the possibility that the composition of the juries would be

arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-

sense judgment of the community and avoiding the appearance of unfairness that would

result from excluding large groups of individuals, not on the basis of their ability to serve as

jurors, *but on the basis of some immutable characteristic such as race, gender or ethnic*

---

[6] At best, Defendant has asserted in his "Sworn Statement of Facts" that he "had friends and family members do google searches and contact different officials in Harrisburg and in the 9 countys [*sic*] that make up the Scranton division of the United States District Court for the Middle District of Pennsylvania" and that "this investigation . . . revealed that these 9 countys [*sic*] do not uniformly require the registration of voters" (Doc. 333, at ¶¶ 5-6).  Defendant's statements are overly-general, conclusory, and fail to set forth in sufficient detail what his "friends and family members" discovered, how he (or they) ascertained that a lack of uniformity existed, and of what the lack of uniformity consisted.

*background*." *Weaver*, 267 F.3d at 236 (some emphasis added).  Rinaldi's Reply brief now

claims that his arguments with respect to the formation of the Master Jury Wheel "has nothing

to do with the race of the voters" but rather is based on "how they determine the

proportionality of representation from each county within the Scranton division," (Doc. 332, at

4).  In so doing, Rinaldi admits that he is making only the most generalized attack on the jury

list selection process, and explicitly not pointing to the exclusion of any "distinctive group."

Rinaldi has not shown how the Middle District of Pennsylvania's practices prevent him from

having a jury selected at random from a fair cross section of the community, where he is not

arguing that any distinctive groups are being excluded nor that any person is being excluded

on the basis of an immutable characteristic; otherwise stated, in light of Rinaldi's statement in

his Reply brief, he has not shown, or even alleged, *who* is being underrepresented.

Finally, the Court notes that Defendant's challenge to the jury selection plan is

untimely.  As explained by the Third Circuit:

> a challenge to the procedures under the Act must be made "before the voir dire
> examination begins, or within seven days after the defendant discovered or
> could have discovered, by the exercise of diligence, the grounds therefore,
> whichever is earlier." 28 U.S.C. § 1867(a). The motion must contain a "sworn
> statement of facts which, if true, would constitute a substantial failure to comply
> with the provisions of this title." *Id.* § 1867(d). Courts have uniformly required
> strict compliance with these procedures.

*United States v. Calabrese*, 942 F.2d 218, 222 (3d Cir. 1991).

Here, Defendant requested information regarding the Court's jury selection process

several times in 2019 (*see e.g.* Doc. 118 (filed January 31, 2019), Doc. 179 (filed July 29,

2019), Doc. 193 (filed August 19, 2019)). The docket reflects that the Jury Clerk responded to Defendant's requests on August 2, 2019 (Doc. 187) and August 28, 2019 (Doc. 195). The Court has also reviewed additional letters, not filed on the docket, sent to the Jury Clerk from Defendant's stand-by counsel and from Defendant, and the Jury Clerk's letters in response, as well as the documents sent to Defendant and his stand-by counsel by the Jury Clerk. These letters are dated between January, 2019, and August, 2019. The letters from the Jury Clerk during this time also contained enclosures including the Juror Selection Plan for the United States District Court for the Middle District of Pennsylvania, the County Breakdown listing which counties are included in each of the three divisions of the Middle District of Pennsylvania (Scranton/Wilkes-Barre, Harrisburg, and Williamsport), and the Scranton/Wilkes-Barres Division County Breakdown for the Master Jury Wheel which includes the number of voters in each of the counties in this division and the percentage of the number of voters in the Master Jury Wheel from each county. Upon review, it appears that the last letter and documents sent to Defendant by the Jury Clerk was on August 28, 2019. The docket, and this Court's review of the additional letters sent by, and to, Defendant and his stand-by counsel, do not reflect that any further communication regarding jury questions were raised after this time.

In his Reply brief, Rinaldi claims that he "has diligently sought the information to develop this claim and filed his motion to dismiss within 7 days of discovering that the court was not in compliance with the provisions for selecting jurors." (Doc. 332, at 3). This

conclusory and self-serving assertion has no basis in the record.  Rather, by the end of August, 2019, Defendant had been provided all requested documents addressing the Court's juror selection plan.  To claim, 11-months later and without explanation, that he has just discovered that "the court [is] not in compliance with the provisions for selecting jurors", strains credulity.  Furthermore, Defendant failed to submit a sworn statement of facts with his motion.  Although Defendant belatedly filed this statement two weeks later (Doc. 333), it does nothing to advance his claim.  Rather, the statement sets forth, in relevant part, the following "facts":

- "Throughout the course of this litigation Rinaldi has been seeking information on this courts [*sic*] selection of jurors."

- "Rinaldi was provided with a number of different documents from the clerk."

- "To further this inquiry Rinaldi had friends and family members do google searches and contact different officials in Harrisburg and in the 9 countys [*sic*] that make up the Scranton division of the United States District Court for the Middle District of Pennsylvania."

- "As a result of this investigation it was revealed that these 9 countys [*sic*] do not uniformly require the registration of voters."

- "For this reason this courts [*sic*] voter registration list use for purposes of drawing jurors does not comply with 28 USC 1863(b)(3)."

(Doc. 333, at ¶¶ 3-7).  Carefully missing from this "Sworn Statement of Facts" is any statement as to when Rinaldi requested that his "friends and family members do google searches and contact different officials in Harrisburg and in the 9 countys [sic]", and when it was "revealed" to him that the 9 counties "do not uniformly require the registration of voters." Regardless, in light of Defendant's receipt of a number of documents from the Jury Clerk in 2019 and his admission that he "was provided with a number of difference documents from the clerk", it cannot be said that he exercised "diligence" to "discover" the basis for his present claim, first asserted on July 9, 2020 (see Doc. 310), that the Middle District of Pennsylvania's jury selection plan "substantial[ly] fail[s] to comply with the provisions of [the Jury Selection and Service Act] in selecting the grand or petit jury", 28 U.S.C. § 1867(a).[7]

Rinaldi belatedly suggests that "this court . . . hold a hearing in which Rinaldi can present testimony of the jury clerk . . . to support Rinaldi's contention that in the 9 counties that make up the Scranton division there is no uniform requirements that people register to vote." (Doc. 332, at 4).  Rinaldi is not entitled to a hearing on his motion.  Pursuant to § 1867, upon the filing of a *timely* motion "containing a sworn statement of facts which, if true,

---

[7] Taking Defendant's sworn statement of facts as true (where such asserted facts are not merely conclusory statements), Defendant has also not presented any argument, legal authority, or evidence, to support an assertion that the Middle District of Pennsylvania's jury selection plan "substantial[ly] fail[s] to comply with the provisions of [the Jury Selection and Service Act] in selecting the grand or petit jury", 28 U.S.C. § 1867(a).  See Calabrese, 942 F.2d at 227 ("By its terms, the Act only provides a remedy for *substantial* failures to comply with its provisions. 28 U.S.C. § 1867(d) . . . .  In determining whether a violation is substantial, the alleged violations must be weighed against the underlying principles of the Act. These principles are (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.") (internal citations and quotation marks omitted) (emphasis in original).

would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence", 28 U.S.C. § 1867(d).  Here, Rinaldi's motion was not timely.  Nor, for the reasons discussed above, has Defendant set forth one or more sworn statements of facts which, if true, would demonstrate a substantial failure to comply with the provisions of the Jury Selection and Service Act.  "To determine whether to permit a hearing on a criminal defendant's statutory or constitutional claim that he has not been or will not be tried by a jury reflecting a fair cross-section of the community in which the crime was committed, the Court must be apprised not only of the legal contention but also of the demographic data supporting the contention."  *United States v. Stone*, 1993 WL 246047, \*4 (E.D.Pa. 1993).  Defendant has failed to meet this burden – although Rinaldi has vaguely set forth a legal contention, he has not set forth any factual support, including any demographic data, for this claim.  In addition, as previously explained, Defendant has not sufficiently shown or alleged the under-representation of any particular group.  *See e.g., United States v. Miller*, 771 F.2d 1219, 1228-1229 (9th Cir. 1985) ("Because appellants' motion and supporting affidavit failed to establish that underrepresentation occurred generally or in venires other than their own, the district court did not err in denying them an evidentiary hearing on their challenge to the composition of the grand jury.").  The Court is also compelled to note, as did the Court in

*Stone*, that Rinaldi's delayed motion to dismiss on the basis of violations of the Jury

Selection and Service Act, unsupported by any evidence, may be viewed as an attempt by

Defendant to continue his trial, despite his assertions to the contrary.

> Given the lateness and insufficiency of these motions, permitting defendants to
> go forward with their challenge would completely derail the judicial process. If
> defendants could delay their criminal trials merely by filing last minute motions
> based upon unsupported allegations, the public's interest in the speedy
> resolution of criminal matters would be nullified and the Judge's duty to ensure
> the orderly and efficient administration of justice frustrated. Requiring counsel
> first to make an initial showing of underrepresentation in the venire before
> permitting discovery and staying the trial is not a substantial hurdle to jump and
> does not unduly restrict a criminal defendant's constitutional and statutory
> rights. Data pertaining to the latest census and the qualified jury wheel for the
> Eastern District of Pennsylvania is readily available to the public either directly
> from the Clerk of Court's office or through timely application to the Court.

*Stone*, 1993 WL 246047, at * 5.

For each of the afore-discussed reasons, Defendant's motion to dismiss on the basis

that "[t]he process by which the Scranton division of The United States District Court for the

Middle District of Pennsylvania uses to select both grand and petit jurors does not comply

with the directives of 28 U.S.C. [§§] 1861, 1862, 1863 and 1867" (Doc. 310, at 4-5) will be

denied.

Last, "Ground Three" of Defendant's motion to dismiss asserts that "[a]t each stage of

the proceedings [he] had his Due Process or his statutory rights violated." (Doc. 310, at 7).

In support of his broad allegation, Defendant argues that he "was initially arrested

without a warrant and absent probable cause." (Doc. 310, at 7). Rinaldi contends that after

co-defendant Dwayne Brown "was caught in possession" of cocaine, Rinaldi was arrested

and "at this time probable cause to arrest Rinaldi was fabricated and a few days later a complaint was issued." (*Id*.).

Preliminarily, Rinaldi does not state the basis for his assertion that "lies, omissions, misleading information or fabrications . . . were used in this case" to arrest and indict him. Rather, he only states that "most of them are contained in Rinaldi's motion to suppress and for a Franks hearing." (Doc. 310, at 7). To the extent that Rinaldi's current motion is an attempt to re-litigate his prior Motion to Suppress and for a *Franks* Hearing (Doc. 81), filed December 10, 2018, Defendant is unable to do so in this manner. Rinaldi presented these arguments to the Court and later withdrew the motion to suppress and for a *Franks* hearing in its entirety (*see* Doc. 238). Defendant has failed to properly raise his arguments again here to support a vague assertion of a lack of probable cause to arrest or indict him where the Middle District of Pennsylvania's Local Rules clearly prohibit a litigant from incorporating by reference any portion of any other brief. *See* M.D.Pa. L.R. 7.8(a) ("No brief may incorporate by reference all or any portion of any other brief.").

The Court turns to the arguments properly raised by Rinaldi in his present motion. Therein, Rinaldi argues that the evidence used to secure the Indictments in case numbers 3:18-cr-279 (Doc. 37) and 3:18-cr-280 (Doc. 1), both filed August 21, 2018, "drastically differs from" the evidence "used to seek th[e] superseding indictment" in 3:18-cr-279. (Doc. 310, at 7, 8). Thus, Rinaldi contends that the "differences can be attributed to the fact that his case was based on lies, omissions, misleading information and speculation," and "not

the result of an investigation which properly established probable cause to arrest Rinaldi."
(*Id*. at 8). Rinaldi's argument – that because the original indictments differ from the
superseding indictment, his arrest and indictment in August of 2018 could not have been
based on probable cause – presents an inferential leap unsupported by any evidence, case
law, or substantive argument.

Here, a United States Magistrate Judge signed a Criminal Complaint, based on an
Affidavit of Probable Cause from DEA Agent Thomas Kaluzny.  The Affidavit relied on wire
and electronic communications of phones used by Rinaldi, detailed specific recorded
conversations from the phones, and the recovery of drugs in another individual's car who
was communicating with Rinaldi, and physical surveillance "and other investigative
techniques" in setting forth the probable cause "to believe that Dwayne Romail Brown,
Michael Rinaldi, and Andrew Henry have conspired with each other and others to distribute
and possess with intent to distribute cocaine, a Schedule II controlled substance, in violation
of 21 U.S.C. Section 846."

Rinaldi was thereafter indicted by a grand jury, which conclusively determines the
existence of probable cause to implicate a defendant in a crime.  As explained by the
Supreme Court:

> This Court has often recognized the grand jury's singular role in finding the
> probable cause necessary to initiate a prosecution for a serious crime. See,
> *e.g., Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397
> (1956). "[A]n indictment 'fair upon its face,' and returned by a 'properly
> constituted grand jury,' " we have explained, "conclusively determines the
> existence of probable cause" to believe the defendant perpetrated the offense

alleged. *Gerstein v. Pugh,* 420 U.S. 103, 117, n. 19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Ex parte United States,* 287 U.S. 241, 250, 53 S.Ct. 129, 77 L.Ed. 283 (1932)).

*Kaley v. United States*, 571 U.S. 320, 328 (2014). Here, where Rinaldi was arrested prior to the issuance of the Indictments, "if the person was arrested without a warrant, an indictment eliminates [his] Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention," *id*. at 329.

Rinaldi has not set forth any explanation for his assertion that the probable cause found by the Magistrate Judge in signing the Criminal Complaint, or the grand jury in issuing indictments in two cases involving the defendant in 2018, was "fabricated." His sole reliance on the fact that the original indictments differ in some ways with the Superseding Indictment, without more, is woefully insufficient to support an argument that his arrest, and the two indictments, in 2018 were "not the result of an investigation which properly established probable cause to arrest Rinaldi" (Doc. 310, at 8).

Rinaldi's final argument in support of "Ground Three" of his motion to dismiss is that "the government has and continues to induce [his] co-defendants to violate the bribery statute." (Doc. 310, at 11).[8] Defendant asserts that his co-defendants "are receiving the

---

[8] Rinaldi also argues that the fact his co-defendants are not detained but he has not been granted pre-trial release is evidence that he is being punished for not cooperating with the Government or not pleading guilty. (Doc. 310, at 10-11). The Court has previously addressed this unmeritorious argument several times and declines to do so again herein.

promise of a reduced sentence in exchange for testimony", in violation of 18 U.S.C. §

201(c)(3).  (*Id.*).

Preliminarily, as noted by the Government, Rinaldi's argument is premised on his

"speculati[on] that certain codefendants have entered into . . . agreements with the

government" that it will file a downward departure motion under Section 5K.1.1 should that

person testify at trial, or should they have already testified before a grand jury, (Doc. 313, at

19).  Nonetheless, the Court will assume herein, for the sole purpose of fully addressing

Defendant's motion, that Defendant is correct that one or more co-defendants have entered

into agreements which may result in the Government later moving for a 5K1.1 departure.

Section 201, entitled "Bribery of Public Officials and Witnesses", provides in relevant

part that:

> **(c)** Whoever--
>
> . . . .
>
> > **(2)** directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;
> > **(3)** directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom;
>
> shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2)-(3).

Rinaldi properly acknowledges that "[t]he courts have already ruled that the U.S. Attorney does not violate 201(c)(2) when they give a witness a 5.K1.1 in exchange for testimony." (Doc. 310, at 11). *See e.g. United States v. Abraham*, 29 F.Supp.2d 206 (D.N.J. 1998); *United States v. Hammer*, 25 F.Supp.2d 518 (M.D.Pa. 1998) (to conclude "that prosecutors commit a federal criminal offense when they engage in the common practice of offering lenity for a witness' truthful testimony [is] an extreme and radical departure from history, practice, and established law" which "make[s] a criminal out of nearly every federal prosecutor – and accomplices out of district judges – [and] it suppresses highly relevant evidence and cripples enforcement of federal criminal law."); *Nero v. United States*, 1998 WL 744031, *1 (E.D.Pa. 1998) ("the promise or prospect of a § 5K1.1 motion in return for testimony which the government deems to be truthful and of substantial assistance does not violate the bribery statute or otherwise entitle a defendant to set aside his conviction or sentence."); *United States v. Haese*, 162 F.3d 359, 367 (5th Cir. 1998) ("it is evident to this Court that Congress did not intend for section 201(c)(2) to be used when prosecutors offer lenity for a witness' truthful testimony. To interpret section 201(c)(2) in any other way would apply shackles to the government in its pursuit to enforce the law."); *United States v. Ware*, 161 F.3d 414 (6th Cir. 1998); *United States v. Singleton*,

165 F.3d 1297, 1301 (10th Cir. 1999). Nonetheless, Defendant asserts that "[t]his ruling [as

to § 201(c)(2)] does not apply to 201(c)(3)." (Doc. 310, at 11).[9]

Rinaldi does not offer any case law addressing § 201(c)(3) in support of his

argument and the Government states that to "the government's knowledge, no Court has

examined this argument with respect to Section 201(c)(3)" (Doc. 313, at 20). The reason for

this seems clear – § 201(c)(2) and 201(c)(3) are necessarily interdependent where the

Government has offered leniency in exchange for testimony; one subsection cannot allow

for a lawful offer while the other does not allow for a lawful acceptance and execution of the

terms of the agreement. Nonetheless, this Court has found several courts who have

addressed, in passing, the application of § 201(c)(3), all of whom have rejected any

_____

[9] Rinaldi argues that "although there is an exception carved out for the government there is no exception listed for the witness himself", citing to *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998)(*Singleton I*) for the proposition that since the Tenth Circuit's decision in that case in 1998, Congress has been "aware of the statutes possible infirmities but no effort has been made to write in any exception or to fix it." (Doc. 310, at 11-12). In *Singleton I*, the Tenth Circuit reversed a defendant's conviction on the ground that the prosecuting attorney violated 18 U.S.C. § 201(c)(2) when he offered leniency to a co-defendant in exchange for testimony. However, less than a year later, the Tenth Circuit, *en banc*, vacated that decision. In so doing, the Circuit noted that it had "already established the absurdity in trying to apply section 201(c)(2) to the sovereign's prosecutorial powers" and that "applying the statute to the government would deprive the sovereign of a recognized or established prerogative, title, or interest," *United States v. Singleton*, 165 F.3d 1297, 1301 (10th Cir. 1999) (*Singleton II*). As summarized by the Court in *Singleton II*:

This ingrained practice of granting lenience in exchange for testimony has created a vested sovereign prerogative in the government. . . . [I]n an American criminal prosecution, the granting of lenience is an authority that can only be exercised by the United States through its prosecutor; therefore, any reading of section 201(c)(2) that would restrict the exercise of this power is surely a diminution of sovereignty not countenanced in our jurisprudence. Moreover, in light of the longstanding practice of leniency for testimony, we must presume if Congress had intended that section 201(c)(2) overturn this ingrained aspect of American legal culture, it would have done so in clear, unmistakable, and unarguable language.

*Id*. at 1301-1302. Rinaldi's assertion that *Singleton I*, a vacated opinion, in some way supports the position that Congress would have "carved out an exception" for witnesses under § 201(c)(3) if it had not intended them to be prosecuted in exchange for a more lenient sentence is without support or reason.

argument that a witness violates § 201(c)(3) by testifying in exchange for immunity or a reduction in sentence. *See e.g. United States v. Wilson*, 15 F.Supp.3d 126, 137 (D.C.C. 2014) (rejecting Defendant's contentions "that 'paying a fact witness,' *i.e.,* offering a plea agreement to cooperating witnesses in exchange for their trial testimony, 'is in fact a crime, and ... those witnesses accepting payment in exchange for testimony [committed a] crime'" under § 201(c)(2) and (c)(3) because "the government can grant leniency in exchange for a cooperating witness's truthful testimony."); *United States v. Villegas-Rodriguez*, 171 F.3d 224, 230 (5th Cir. 1999) ("Our recent decisions make manifest that the testimony of a witness who has entered into a plea agreement does not violate § 201(c)."); *United States v. Orr*, 136 F.App'x 632, 637 (5th Cir. 2005) ("Citing 18 U.S.C. § 201(c)(3) . . . , Orr maintains Ewell's testimony was illegal because: it resulted from a plea offer; and Ewell was paid $1,000 by the Government to complete 'the transactions'. . . . [A] favorable plea agreement in exchange for truthful testimony does not violate § 201. . .  And, § 201 is not violated when prosecutors compensate informants for their cooperation.") (internal citations and quotation marks omitted); *United States v. March*, 19 F.App'x 445, 448 (8th Cir. 2001) (Defendant "is incorrect in asserting that the government, by entering into plea agreements, bribed its witnesses within the meaning of 18 U.S.C. § 201(c)(3). . . ."); *Ida v. United States*, 207 F.Supp.2d 171, 190 (S.D.N.Y. 2002) (finding Defendant's claim that his "conviction must be vacated because it rests on the testimony of D'Arco and Sessa who, he contends, violated 18 U.S.C. § 201(c)(3) when they provided testimony in exchange for promises made by the

government in their plea agreement" to be "frivolous."). *See also*, *United States v. Lowery*, 166 F.3d 1119, 1123-1124 (11th Cir. 1999) ("These type of [testimony for lenience] agreements have been used extensively in federal prosecutions, both long before and continually since the statutory prohibition in question [§ 201(c)(2)] was enacted. Testimony derived through them is a commonplace feature of trials. In drug cases, at least, it seems more usual than not for the testimony critical to a conviction, or the expected testimony that precipitates a guilty plea, to have stemmed directly from such an agreement. It happens every work day in federal trial courts all around this country, and it has been happening since the first day this language was put on the books thirty-six years ago. If it were plain from the statutory language that entering this type of agreement was a crime, the legions of attorneys who have represented defendants convicted over the years because of testimony dependent upon such illegal agreements would have raised the issue day in and day out in every district court in every circuit in the country. They did not. The sound of their silence is deafening.").

Rinaldi's argument that the established law holding that a prosecutor does not violate § 201(c)(2) by offering an agreement of leniency in exchange for testimony before a grand jury or a trial does not extend to that witness's acceptance of this offer under § 201(c)(3) defies logic. Courts have nearly uniformly held that a prosecutor does not violate § 201(c) when offering a 5K1.1 motion for downward departure in exchange for an individual's testimony. To say that a prosecutor may lawfully offer such an agreement, but that a

witness's acceptance of that offer is unlawful and subject to criminal penalties, presents an unreconcilable situation.  Adoption of such an argument would further produce the absurd result of allowing a prosecutor to lawfully produce the testimony of a witness before a grand jury or at trial and, subsequently, criminally prosecute that same cooperating individual for violation of the bribery statute under subsection (c)(3), a concept paralleling the practice of entrapment.

For these reasons, Rinaldi's motion to dismiss on the basis that "the government has and continues to induce [his] co-defendants to violate the bribery statute" and that his co-defendants "are receiving the promise of a reduced sentence in exchange for testimony" in violation of 18 U.S.C. § 201(c)(3) (Doc. 310, at 11) will be denied.[10]

### III. CONCLUSION

For the afore-discussed reasons, Defendant Michael Rinaldi's "Motion to Dismiss" (3:18-cr-279, Doc. 310; 3:18-cr-280, Doc. 255). will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge

---

[10] Although Rinaldi broadly asserts in "Ground Three" that "[a]t each stage of the proceedings [he] had his Due Process or his statutory rights violated," (Doc. 310, at 7), apart from the issues addressed herein, Rinaldi has not set forth any other specific purported violation of his constitutional or statutory rights.